UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| LAUREL GROCERY COMPANY, LLC, | ) ) ) | |
| Plaintiff / Counterclaim Defendant, | ) ) | No. 6:18-CV-243-REW |
| v. | ) ) | OPINION & ORDER |
| FRESHWAY, INC., et al., | ) ) | |
| Defendants / Counterclaim Plaintiffs. | ) ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Freshway Defendants,[1] operators of several Ohio grocery stores, bought grocery products from Laurel,[2] a Kentucky grocery wholesaler, for a decade or more. In August 2016, Freshway, after receiving bills claiming an unpaid balance exceeding $150,000, began questioning its dealings with Laurel. In 2018, Freshway terminated the relationship. Laurel soon initiated this suit to reclaim the alleged amounts due. Post-removal, Freshway filed its own set of grievances regarding Laurel's conduct as supplier and alleged accountant for Freshway. *See* DE 22 (Am. Answer & Counterclaim). Laurel now targets five of Freshway's counterclaims with a motion for partial dismissal. *See* DE 23.

For the following reasons and under the applicable standards, the Court **GRANTS IN PART** and **DENIES IN PART** Laurel's motion. The Court dismisses Counterclaim Count 5 but permits Counts 1-4 to proceed.

---

[1] The parties do not, in any relevant way, distinguish between Defendants/Counterclaim Plaintiffs for present purposes. The Court, consistent with the briefing treatment, references Counterclaim Plaintiffs, Freshway Inc. and West Salem IGA, as, collectively, "Freshway."

[2] Specifically, Plaintiff/Counterclaim Defendant Laurel Grocery Company, LLC.

# I.     BACKGROUND

*Facts*

Freshway bases the challenged counterclaims on the following factual allegations.[3] In the spring of 2007, Freshway began negotiating a wholesale agreement for grocery products with Laurel based on the anticipated purchase of a grocery store, Rittman IGA. During the talks, Laurel offered, and Freshway accepted the following terms:

> Freshway would receive wholesale grocery products on three-week terms and a 3% rebate on all products purchased by Freshway until the terms were repaid by Freshway. In return, Freshway would buy its groceries from Laurel Grocery during that same period.

DE 22 at 13, ¶ 15; *see also* DE 22-1 (4/20/2007 e-mail in support of alleged promise). In addition to this so-called "Rittman Agreement," Freshway, in March 2007, signed a "Customer Application and Agreement" that set out further terms for Laurel's supply of the Rittman store. DE 1-1 at 22 (Laurel Ex. 2); *see also* DE 22 at 13, ¶ 17 (describing Ex. 2 as a "true and accurate copy" of the subject agreement).

Per Freshway, the 2007 agreements terms concluded in 2009, when Freshway purchased a new store, West Salem IGA. *See* DE 22, at 14–15, ¶¶ 26–29. In December 2009, Freshway and Laurel entered two new agreements governing Freshway's grocery purchases. *See id.* at ¶¶ 29–30 (describing Laurel Exs. 1 & 3 as "true and accurate" copies); DE 1-1 at 16–20 & 25–26 (Laurel Exs. 1 & 3). The 2009 terms included a 2% rebate "for the first five (5) years[.]" DE 1-1 at 16.

Relatedly, Freshway contends that Laurel employed a "staff of accountants and associates to serve independent retailers' accounting needs[,]" to include providing "financial statements and

---

[3] Under the relevant standard, the Court assesses (and, here, recites) the facts in favor of and as alleged by Freshway. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). The factual summary is taken from the Amended Answer & Counterclaim, DE 22.

information to assist [Laurel's] customers in making informed decisions regarding growth and profitability." DE 22 at 12, ¶¶ 6–7. In early 2007, Freshway gave Laurel "exclusive control over [its] books and finances"; Laurel from that point, and for the remainder of the parties' relationship, was Freshway's "accountant[.]" *Id.* at 14, ¶¶ 21, 25. As Freshway tells it, Laurel never applied, and never intended to apply, the 3% rebate during the period of the 2007-09 Rittman Agreement. DE 22 at 17 & 19, ¶¶ 48, 66. Further, Laurel, as accountant, covered up its alleged overcharging by providing Freshway only "sporadic[,] . . . irregularly prepared[,] . . . incomplete and inaccurate" financial records. DE 22 at 16 & 19, ¶¶ 42–43, 60.

Based on these facts, Freshway levels seven state law theories against Laurel. DE 22 at 17–24. Laurel pursues Rule 12 dismissal of Freshway's breach of contract, breach of fiduciary duty, fraudulent inducement, fraudulent misrepresentation, and promissory estoppel claims (Counts 1–5, respectively). *See* DE 23. The motion—fully briefed, *see* DE 24 (Response), DE 25 (Reply)—stands ripe for review.

## Governing Standard

A Rule 12(b)(6) motion targeting counterclaims is subject to the familiar *Twombly / Iqbal* plausibility rubric. *See Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 401 (6th Cir. 2012). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1974 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a formulaic recitation of a cause of action's elements will not do[.]" *Twombly*, 127 S. Ct. at 1965. Courts "must construe the complaint in the light most favorable to the plaintiff and accept all

allegations as true." *Keys*, 684 F.3d at 608. Yet, courts need not accept "legal conclusion[s] couched as [ ] factual allegation[s]." *Papasan v. Allain*, 106 S. Ct. 2932, 2944 (1986). The Court evaluates and tests the well-pleaded Complaint contents. *Peterson v. Ostrander*, No. 17-2160, 2018 WL 4739692, at *2 (6th Cir. Apr. 6, 2018) ("[T]he court must confine its analysis to the pleadings and accept all well-pleaded allegations as true.").

Generally, "matters outside of the pleadings are not to be considered by a court in ruling on a . . . motion to dismiss." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). However, the Court may "consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011) (internal quotation marks and citation omitted).

Hinging on Rule 8's minimal standards, *Twombly* and *Iqbal* require a plaintiff to "plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). Where plaintiffs state "simply, concisely, and directly events that . . . entitle[ ] them to damages," the rules require "no more to stave off threshold dismissal for want of an adequate statement[.]" *Id.*; *El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) ("Although *Twombly* and *Iqbal* have raised the bar for pleading, it is still low.").

## II.      ANALYSIS

### a.  Breach of Contract - Count 1

Laurel argues that the Kentucky UCC's[4] 4-year statute of limitations bars Freshway's claim regarding breach of the 2007 Rittman Agreement. DE 23-1 at 5–6. Freshway contends that the UCC does not govern and that the claim is timely under Kentucky's 15-year limitations period for

---

[4] The Commonwealth's Uniform Commercial Code is codified at KRS Chapter 355. Article 2, governing "sales[,]" KRS 355.2-101 to -725, supplies the relevant provisions for purposes of Laurel's motion.

contracts executed prior to July 15, 2014. KRS 413.090. Alternatively, Freshway avers that Laurel's obfuscation (as Freshway's accountant) of the alleged failure to apply rebates warrants tolling under KRS 413.190(2). The Court, for the following reasons, finds that KRS 355.2-725[5] provides the applicable limitations period and, though the contract claim is facially untimely, that the pleadings plausibly frame a basis for equitable tolling.

<em>Governing Limitations Period</em>

In Kentucky, the sales article of the UCC applies to "transactions in goods[.]" KRS 352.2-102; *see Riffe v. Black*, 548 S.W.2d 175, 177 (Ky. Ct. App. 1977).[6] Kentucky's UCC coverage includes "mixed contracts for goods and services where the predominant factor is the sale of goods." *Marley Cooling Tower Co. v. Caldwell Energy & Envtl., Inc.*, 280 F. Supp. 2d 651, 659 (W.D. Ky. 2003); *see also Riffe*, 548 S.W.2d at 177 (finding UCC warranty provisions applicable to "services when the sale is primarily one of goods and the services are necessary to insure that those goods are merchantable and fit for the ordinary purpose"). Freshway contends that the Rittman Agreement only "tangentially involved the purchase of goods" and that "its primary purpose was to provide Freshway with the means to purchase [the] Rittman" store. DE 24 at 7. But, two significant problems:

---

[5] Laurel asserts, and Freshway does not dispute (at least for purposes of this motion), *see* DE 24 at 7 n.25, that substantive Kentucky law applies in this diversity case; the Court, accordingly, undertakes no independent choice-of-law analysis. *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003); *see also* DE 1-1 at 20 ("This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Kentucky.").

[6] For UCC purposes, "Goods" include, in relevant part, "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, . . . the unborn young of animals[,] and growing crops[.]" KRS 355.2-105(1). Freshway does not dispute Laurel's contention that the subject "wholesale grocery products" fall within this definition. DE 22 at 13, ¶ 15. Accordingly, the Court declines further analysis of this topic.

5

First, the operative pleading contains neither direct allegations to this effect or inferential support for the argument. Indeed, the pleaded facts are to the contrary. *See, e.g.*, DE 22 at 13, ¶ 14 ("agreement regarding Freshway's purchases from Laurel Grocery"); *id.* at ¶ 15 (alleging that, under the Rittman Agreement, "Freshway would receive wholesale grocery products" and "Freshway would buy its groceries from Laurel Grocery"). Second, Freshway expressly contradicts its theory as to store-purchase primacy by also contending that "the Rittman Agreement was **tangentially related** to Freshway's purchase of" the Rittman store. DE 24 at 14 n.37 (emphasis added). Though Freshway's briefing vacillates between theories as to the Rittman's Agreement's purpose, the relevant pleading is unequivocal.

The Court finds that Freshway unambiguously alleges a contract predominantly concerned with the sale of goods. Freshway pleads that Laurel "set forth the terms of the Rittman Agreement in" an April 20, 2007, e-mail. *See* DE 22 at 13, ¶ 16. The subject e-mail directly speaks to purchases of goods from Laurel. *See* DE 22-1 at 4 ("Opening Inventory purchased from Laurel"). Moreover, the crux of Freshway's breach counterclaim is Laurel's alleged promise to grant a "3% rebate on **all products purchased by Freshway**[.]" DE 22 at 13, ¶ 15. Freshway's contention that the <u>primary</u> concern of an agreement setting terms for Freshway expenditures was to provide it the "means to purchase" a business is illogical and, on the pleaded facts, wholly unfounded. Because

Freshway alleged an agreement to purchase goods from Laurel, the KRS 355.2-725(1) four-year limitations period governs Freshway's breach claim.[7]

## Timeliness Generally

Freshway does not dispute Laurel's contention that, per the pleading, any breach of the alleged Rittman Agreement must have occurred in or before 2009. *See* DE 23-1 at 5. Freshway's factual claims fully support this contention.[8] Thus, Freshway's 2019[9] counterclaim is facially untimely and, absent delayed accrual or tolling, barred by KRS 355.2-725(1).

## Statutory Tolling & Equitable Estoppel

Three state-law provisions frame the balance of the parties' timeliness dispute. Under KRS 355.2-725(2), "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Thus, in the Commonwealth, a sales contract "breach can occur before the aggrieved party actually knows of it and is damaged by it." *Willits v. Peabody Coal Co.*, 188 F.3d 510 (6th Cir. 1999) (table). Notwithstanding this unflagging accrual rule, per

---

[7] The Court is cognizant of the Sixth Circuit's general reluctance "to dismiss complaints based on affirmative defenses at the pleading stage and before any discovery has been conducted." *Lockhart v. Holiday Inn Exp. Southwind*, 531 F. App'x 544, 547 (6th Cir. 2013). However, an exception applies "where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008); *see Marsh v. Genentech, Inc.*, 693 F.3d 546, 554–55 (6th Cir. 2012) ("A motion to dismiss can be premised on an affirmative defense . . . if 'the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief.'" (internal citation omitted)). Whether the pleading, here, meets that exception is the question that the Court must answer.

[8] *See, e.g.*, DE 22 at 14, ¶ 26, 28 (alleging that the Rittman Agreement would be fully concluded on or before "the individuals involved in Freshway" purchased the West Salem store); *id.* at 15, ¶ 30 (claiming West Salem entered a contract with Laurel on December 30, 2009, and that Laurel's Ex. 3 represents a "true and accurate copy of that document"); DE 1-1 at 25 (identifying "Robert M. Foutty" as, by December 30, 2019, the owner of "West Salem IGA").

[9] Though the current operative pleading is the second iteration of Freshway's counterclaims, the April 15, 2019, amended version marked the first time that Freshway identified the "Rittman Agreement" or alleged breach of same. *Compare* DE 4 (Answer & Counterclaim), *with* DE 22 (Amended Answer & Counterclaim).

subsection (4), "the law on tolling" persists. KRS 355.2-725(4). Thus, Freshway contends, DE 24 at 11, that it has pleaded facts to justify tolling under KRS 413.190:

> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced. But this saving shall not prevent the limitation from operating in favor of any other person not so acting, whether he is a necessary party to the action or not.

KRS 413.190(2). Laurel argues that KRS 413.190 is inapplicable because the tolling statute's cross-referenced coverage—KRS 413.090 to 413.160—does not include KRS 355.2-725. DE 25 at 3. Laurel, however, cites no authority for its interpretation of KRS 355.2-725. Further, the Court notes that KRS 413.190 extends to "**causes of action** mentioned in" the referenced limitations statutes, not merely to claims subject to the limitations periods those provisions supply. *See id.* Those causes of action include contract claims. In any event, the Court, for present purposes, need not decide whether KRS 413.190 applies to UCC sales contracts. The tolling statute is merely "a codification of equitable estoppel principles[.]" *500 Assocs., Inc. v. Vermont Am. Corp.*, 496 F. App'x 589, 595 (6th Cir. 2012); *see also Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 573 (Ky. 2009) (KRS 413.090(2) "is essentially a recognition in law of an equitable estoppel or estoppel in pais to prevent a fraudulent or inequitable resort to a plea of limitations.").

Equitable estoppel, as a tolling mechanism, remains vital in the Commonwealth despite the statutory option:

> The essential elements of equitable estoppel are[:] (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as

to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 62 (Ky. 2010). Further,

[T]he plaintiff "is under the duty to exercise reasonable care and diligence to discover whether he has a viable legal claim," and "any fact that should excite his suspicion is the same as actual knowledge of his entire claim." . . . Thus, to overcome the . . . motion to dismiss, [plaintiff] must have pled facts that support a plausible conclusion that the [defendant's] actions, prevented [plaintiff] from inquiring into her causes of action, despite her reasonable attempt to do so.

*Gilley v. Dunaway*, 572 F. App'x 303, 306–07 (6th Cir. 2014) (internal alterations and citation omitted).[10] "[C]oncealment ordinarily requires an affirmative act, [but] where the law imposes a duty of disclosure, a failure of disclosure may constitute concealment under KRS 413.190(2), or at least amount to misleading or obstructive conduct." *Munday v. Mayfair Diagnostic Lab.*, 831 S.W.2d 912, 915 (Ky. 1992).

Given the applicable four-year limitations period, Freshway needed to viably claim that it could not have, with due diligence, discovered the alleged breach until approximately 2014. The Court, properly viewing the pleaded facts in a Freshway-favorable light, sees plausible allegations

---

[10] The *Gilley* Court addressed tolling under the interchangeable fraudulent concealment appellation. *See id.* The theory, however styled, is ultimately the same. *See Bridgeport Music Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004) ("Equitable estoppel, sometimes referred to as fraudulent concealment, is invoked in cases where the defendant takes active steps to prevent the plaintiff from suing in time.").

that Laurel not only had a legal duty to disclose,[11] but also engaged in affirmative, obstructive hornswoggling throughout the parties' relationship. *See, e.g.*, DE 22 at 14, ¶ 25 ("Laurel Grocery used its position as accountant for Freshway in order to keep legitimate financial information from Freshway and to manipulate the books and records of Freshway."); *see also id.* at 17, ¶ 45 (alleging specific modified or inconsistent documentation).

Certainly, Freshway had a persisting duty to exercise "reasonable care and diligence to discover whether [it] had a viable legal claim[.]" *Gilley*, 572 F. App'x at 308–09 (citation omitted). And, "there is no fraudulent concealment if the plaintiff is aware of facts that should have aroused her suspicion of the claims[.]" *Id.* (alterations, quotation marks, and citation omitted). However, Rule 12 dismissal on statute of limitations grounds is appropriate only when "the allegations in the [pleading] affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). The counterclaim does not positively demonstrate (and Laurel does not argue) that Freshway failed to exercise reasonable care or that it was aware of facts that should have put it on notice of the alleged breach. Rather, Freshway's claim is, essentially, that "the

---

[11] Cases applying the "duty of disclosure" to concealment issues have relied on a statutory basis or a relationship sufficiently "intimate" to create a fiduciary relationship. *See, e.g.*, *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 290 (Ky. Ct. App. 1998) ("KRS 199.335, the statute in effect when these incidents occurred, imposed a legal duty on any person to report child abuse to law enforcement authorities."); *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952) (doctor-patient); *Security Trust Co. v. Wilson*, 210 S.W.2d 336, 339 (Ky. 1948) (guardian-ward); *Osborn v. Griffin*, 865 F.3d 417, 439–40 (6th Cir. 2017) ("Plaintiffs and Defendants were in a close family relationship that would have made it difficult for Plaintiffs to question their brothers' integrity or demand a detailed accounting of the brothers' business activities."); *Alexander v. Lakes*, No. 2007-CA-001196-MR, 2009 WL 102893, at *2 (Ky. Ct. App. Jan. 16, 2009) (holding no disclosure duty triggered in relationship between "business associates and friends"); *In re MERV Properties, LLC*, No. 11-52814, 2014 WL 801509, at *4 (Bankr. E.D. Ky. Feb. 27, 2014) (finding no disclosure duty in "debtor-creditor" relationship "in which the parties deal with each other at arms length"). The Court takes up this topic in greater detail in analyzing Laurel's challenge to Freshway's breach of fiduciary duty claim. For now, suffice it to say that Freshway plausibly alleges an accountant-client relationship that the Court does not find, as a matter of law at this stage, non-fiducial.

information asymmetry between [Laurel] and [Freshway] and [Laurel's] active ability to conceal were such that [Freshway] could not have" discovered the alleged non-payments until 2016. *Dodd v. Dyke Indus., Inc.*, 518 F. Supp. 2d 970, 976 (W.D. Ky. 2007); *see* DE 22 at 18, ¶ 52 ("Due to Laurel['s] concealment and misrepresentations, Freshway was unable to discover Laurel Grocery's breaches[.]").  In this scenario, the general rule that a 12(b)(6) motion is "an inappropriate vehicle for dismissing a claim based upon the statute of limitations" controls. *Cataldo*, 676 F.3d at 547. Count 1, for now, survives.

### b.  Common Law Theories (Counts 2–5)

Laurel offers two categories of dismissal argument concerning Freshway's Counts 2 through 5. First, Laurel contends that the economic loss rule bars Freshway's fraudulent misrepresentation and breach of fiduciary duty claims. Second, Laurel argues that Freshway's fiduciary duty, fraudulent inducement, and promissory estoppel claims are improper attempts to duplicate the breach of contract theory.

The Court finds the promissory estoppel claim dismissibly duplicative of the contract claim, but finds the other targeted causes permissibly state alternative theories of recovery.

*Economic Loss Rule Generally*

This Court has previously articulated the scope of Kentucky's foundational decision on the economic loss rule:

> Kentucky's economic loss rule "prevents the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 733 (Ky. 2011). The "rule recognizes that economic losses, in essence, deprive the purchaser of the benefit of his bargain and that such losses are best addressed by the parties' contract and relevant provisions of Article 2 of the Uniform Commercial Code." *Id.* at 738. "Three policies support applying the economic loss doctrine to commercial transactions: (1) it maintains the historical distinction between tort and contract law; (2) it protects parties' freedom to allocate

economic risk by contract; and (3) it encourages the party best situated to assess the
risk of economic loss, usually the purchaser, to assume, allocate, or insure against
that risk." *Id.* at 739 (quoting *Mt. Lebanon Pers. Care Home, Inc. v. Hoover
Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).

*Kamps, Inc. v. Mustang Aviation, Inc.*, No. 5:18-CV-430-REW, 2018 WL 6709714, at *2 (E.D.

Ky. Dec. 20, 2018). Since *Giddings*, the Commonwealth's highest court has commented further

on the topic.

In *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 792 (Ky.

2017), the Court, though noting the non-binding nature of the opinion, found the rationale of the

two-justice concurrence in *Presnell Constr. Managers, Inc. v. EH Constr.*, 134 S.W.3d 575 (Ky.

2004) persuasive and "consistent with" a prior published decision from what was then Kentucky's

court of last resort, *Alberti's Adm'x v. Nash*, 282 S.W.2d 853, 854 (Ky. 1955). Further, in *Nami

Resources Co., LLC v. Asher Land and Mineral, Ltd.*, 554 S.W.3d 323 (Ky. 2018), involving a

challenge to a punitive damage award and lease agreements governing natural gas extraction, the

Kentucky Supreme Court "reaffirmed" what that Court characterized as a *Superior Steel*

"holding":

> A breach of duty which arises under the provisions of a contract between the parties
> must be addressed under contract, and a tort action will not lie. A breach of a
> duty *arising independently* of any contract duties between the parties, however,
> may support a tort action.

*Id.* at 336 (emphasis in original). As the parties' briefing makes clear, federal courts interpreting

*Giddings* have varied widely in their predictions on the doctrine's ultimate scope under Kentucky

law. The latest statements from the Commonwealth, *Superior Steel* and *Nami*, strongly suggest

that, as Justice Keller referenced in his *Presnell* concurrence, the best "indicator of whether an

action is appropriate in tort" or barred by the economic loss rule "is the source of the duty upon which the tort claim is premised." *Presnell*, 134 S.W.3d at 589 (Keller, J., concurring).[12]

*Fraudulent Misrepresentation – Count IV*

The gist of Freshway's fraudulent misrepresentation theory is that Laurel, "throughout [the parties'] contractual relationship," allegedly represented, consistently and falsely, that the 3% rebate "had been applied as agreed." DE 22 at 20–21, ¶¶ 74–81. Freshway claims it detrimentally relied on such representation by continuing to "purchase products from Laurel" under the contracts and refraining from "collection and demand of payments and credit to which it was owed" under the agreements. *Id.* at 21, ¶ 78. Laurel contends that the economic loss rule bars the claim.

The *Nami* Court approved the following explication of the economic loss rule's rationale:

> The economic loss doctrine requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise. To that end, the economic loss rule prohibits the recovery of tort damages in a breach of contract case. Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving one into the other. Courts have applied the economic loss rule to bar fraud claims where the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract. In such cases, permitting a fraud claim to proceed would open the door to tort claims in virtually every case in which a party promised to make payments under a contract but failed to do so.

---

[12] To be sure, certain categorical limits pertain. *See State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 334–35 (6th Cir. 2017) (predicting that "the Supreme Court of Kentucky would not extend the economic loss rule to consumer transactions"). But no party has pointed to, and the Court's research did not reveal, any binding decision indicating that Freshway's claims fall outside the economic loss rule's ambit. Freshway cites *Rodrock v. Gumz*, which essentially predicted that Kentucky would limit the economic loss rule to the *Giddings* facts. *See* No. 4:11-CV-141-JHM, 2012 WL 1424501, at *3 (W.D. Ky. Apr. 24, 2012). Yet, Chief Judge McKinley did not have the benefit of *Superior Steel* or *Nami* in deciding *Rodrock*. And, post-*Giddings* the Commonwealth has espoused a more expansive view of the doctrine. *See Superior Steel*, 540 S.W.3d at 792 (examining, under the economic loss rubric, viability of a tort claim intertwined with a contract for construction services and finding that "a party having viable contract and negligence claims may pursue both," but the "initial inquiry is whether there is a negligence claim independent of the contract claim"). [Though *Superior Steel* expressly designated its discussion of this topic as dicta, *see id.* at 792 n.23, the *Nami* Court expressly "reaffirm[ed]" *Superior Steel*'s "appli[cation of] the economic loss doctrine" as a "holding[.]" *See* 554 S.W.3d at 336.]

554 S.W.3d at 335–36 (quoting *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 991–92 (E.D. Cal. 2012)) (internal citations and quotation marks omitted). Here, Freshway's claim largely tracks *Nami*'s application of the economic loss rule. That is, Freshway claims a "breach of contract 'accomplished through fraud,' as was the case in *Nami*." *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, No. 6:12-CV-91-GFVT-HAI, 2019 WL 4597500, at *6 (E.D. Ky. Sept. 23, 2019).

However, *Nami* applied the rule only to exclude a punitive damages recovery for fraud; the holding did not bar the fraud claim entire. That is, *Nami* "reiterate[d] the rule in Kentucky to be that when a plaintiff **may obtain complete relief** for his contractual losses by means of compensatory damages under a breach of contract claim, even when the breach is motivated by malice and accomplished through fraud, he may not **simultaneously recover punitive damages after being made whole** on his contractual damages." 554 S.W.3d at 336 (emphasis added).[13]

---

[13] The Court has wrestled with *Nami*'s proper reach. At bottom, *Nami*'s principal concern was that **damages** in such overlapping tort-contract scenarios do not exceed the limits of the contract-based recovery. The *Nami* Court's discussion of the economic loss rule, and framing of same, so suggest. *See* 554 S.W.3d at 335 (beginning its discussion of punitive damages with "the general rule that punitive damages are not ordinarily recoverable for a breach of contract"); *id.* ("The rule against recovery of punitive damages even when the breach is claimed to have been 'fraudulent' is further supported by the 'Economic Loss Doctrine'."); *id.* at 336 ("may not simultaneously recover punitive damages after being made whole on his contractual damages"). This colors the Court's view of portions of *Nami* that might arguably be read to extend the loss-doctrine's bar to Freshway's full fraud cause of action. *See, e.g., id.* at 336. The Sixth Circuit's recent prediction concerning Kentucky's amenability to extension of the doctrine bolsters the Court's disinclination to stray from *Nami*'s direct scope. *See State Farm*, 849 F.3d at 331–35 (discussing *Giddings*, 348 S.W.3d 729, noting Kentucky's "skepticism of the rule[,]" and predicting that "the Supreme Court of Kentucky would not extend the economic loss rule to consumer transactions"). Thus, the Court declines to read a holding barring fraud claims into *Nami*'s punitive damages ruling. Kentucky has not affirmatively taken that step and Laurel, the burden-holder, has not made the argument (or, indeed, even cited *Nami*). *See Eifler v. Greenamyer*, No. 2017-CA-000079-MR, 2019 WL 2712618, at *6 (Ky. Ct. App. June 28, 2019) (interpreting *Nami* as barring **jury submission**, rather than alternative pleading, of fraud and contract claims).

Further, a critical principle in Kentucky's economic loss jurisprudence—as stated in the *Presnell* concurrence and cited as consistent with state law in *Superior Steel*—is that "some common law tort claims, such as . . . **fraud** . . . , were expressly designed to remedy economic loss and thus exist independent of a breach of contract claim." *Superior Steel,* 540 S.W.3d at 792 (emphasis added). *Superior Steel* and *Nami*'s allowance of overlapping fraud and contract claims is consistent with Kentucky's longstanding rule that an "essential element in an action for fraud is **not** whether the representation is the consideration for contract for which a separate action may lie." *Hanson v. Am. Nat'l Bank & Tr. Co.*, 865 S.W.2d 302, 307 (Ky. 1993) (emphasis added), *overruled on other grounds by Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483 (Ky. 2002).[14]

To summarize, Kentucky's economic loss rule does not bar claims predicated on a non-contractual duty. The Commonwealth further recognizes that fraud claims, premised on, at bottom, a duty of honesty in qualifying circumstances,[15] stand independent of any contract duty.[16] Thus,

---

[14] Kentucky courts, post-*Giddings* and the Commonwealth's formal adoption of the economic loss rule, continue to rely on *Hanson*. *See Louisville Metro Hous. Auth. Dev. Corp. v. Com. Sec., Inc.*, No. 2012-CA-000073-MR, 2013 WL 3237480, at *10 (Ky. Ct. App. June 28, 2013) (quoting *Hanson*, 865 S.W.2d at 307).

[15] A Kentucky fraud claim has six elements:
> a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury.

*United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

[16] Certainly, it is a foundational contract law principle that: "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, — and nothing else." Oliver Wendell Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 462 (1897). And, per *Nami*, the economic loss rule aims to ensure a clear demarcation between tort and contract law. Yet, the Court sees no risk to either principle from the Court's interpretation of Kentucky law. The effective duty arising out of the Kentucky rule is that a breaching party must not actionably mislead the non-breaching party about the breach; a duty separate from the contractual 'perform or pay' obligation.

"it was permissible for [Freshway] to plead breach of contract and fraud in the alternative[.]" *Eifler*, 2019 WL 2712618, at *6 (citing *Nami*, 554 S.W.3d at 336–37).[17]

Breach of Fiduciary Duty – Count 2

Laurel also argues that the economic loss rule bars Freshway's fiduciary duty claim. Alternatively, Laurel relies on the *Presnell* concurrence and the "general rule" that "failure to perform a contractual obligation typically does not give rise to a cause of action in tort[.]" *See* DE 23-1 at 6 (quoting *Mims v. W.-S. Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007)). However, Laurel's economic loss and alternative *Mims/Presnell* arguments collapse to the extent that a viably alleged non-contractual duty would defeat both.

Again, Kentucky's economic loss rule applies only in the absence of a non-contractual duty. *See Nami*, 554 S.W.3d at 336.[18] Per the Sixth Circuit, *Mims* stands for the proposition that tort "liability . . . must be predicated on an extra-contractual **duty**." *RQSI Glob. Asset Allocation Master Fund, Ltd v. Apercu Int'l PR LLC*, 683 F. App'x 497, 502 (6th Cir. 2017) (emphasis added)

---

[17] Laurel's initial filing included a brief, footnoted argument concerning lack of particularity under Rule 9(b). *See* DE 23-1 at 11 n.3. Freshway's response thoroughly addressed this topic. *See* DE 24 at 19–21. Laurel did not press the theory in reply, and the Court, on this record, sees no Rule 9 basis for dismissal. Freshway attached, to its pleading, an e-mail that allegedly contains a fraudulent misrepresentation. *See* DE 22-1. The document is date stamped and the contents, together with the full pleading, satisfy the Rule 9 predicates. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) ("The Sixth Circuit interprets Rule 9(b) as requiring plaintiffs to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.") (citation and quotation marks omitted).

[18] Laurel initially relies on federal courts' pre-*Giddings* efforts to anticipate Kentucky's application of the doctrine. *See* DE 23-1 at 7 (citing *Mt. Lebanon*, 276 F.3d at 848; *Highland Stud Int'l v. Baffert*, No. 5:00-CV-261-JMH, 2002 WL 34403141, at *2 (E.D. Ky. May 16, 2002)). However, as Judge Hood noted in *Highland Stud*: "*Hoover Universal* turns on the Sixth Circuit's *prediction* of Kentucky law. For this reason, this application is subject to revision by the courts of Kentucky, of course." 2002 WL 34403141, at *2 n.3 (emphasis in original). Kentucky has since directly weighed in on the topic. Accordingly, *Giddings* and its progeny present the proper analytical starting point for Kentucky's economic loss doctrine.

(citing *Mims*, 226 S.W.3d at 836). Or, to finish Laurel's truncated *Mims* quote: "[I]f a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though the acts complained of also constitute a breach of contract." *Mims*, 226 S.W.3d at 836 (citation omitted); *see also Morgan v. HSBC Mortg. Servs., Inc.*, 930 F. Supp. 2d 833, 839 (E.D. Ky. 2013) ("As the [parties'] relationship . . . was contractual, the sustainability of [plaintiff's tort] claim . . . turns on" the existence of "an independent duty[.]"). Here, Freshway alleges that Laurel owed it both contractual and fiduciary duties. *See* DE 22 at 17–18, at ¶¶ 48 & 57. Nonetheless, Laurel insists that when Freshway says fiduciary duty, it really means contract duty. DE 23-1 at 7. The Court, for two reasons and for now, rejects the interpretation Laurel poses.

First—Freshway plausibly alleged a non-contractual fiduciary relationship with Laurel.[19] In Kentucky, "as a general rule, a fiduciary relationship turns on trust or confidence reposed by one person in the integrity and fidelity of another that necessarily involves an undertaking in which a duty is created in one person to act *primarily for another's benefit* in matters connected with such undertaking." *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 770–71 (6th Cir. 2009) (internal quotation marks omitted) (emphasis added) (quoting *Steelvest Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 485 (Ky. 1991)). In the Commonwealth, a party claiming a fiduciary relationship must show: First, that "the relationship existed before the transaction that is the subject of the action. Second, . . . that reliance was not merely subjective. Third, . . . that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action

---

[19] On this record, if Laurel owed Freshway fiduciary duties, they were not based on the contract. *Cf. Forsythe v. BancBoston Mortg. Corp.*, 135 F.3d 1069, 1077 (6th Cir. 1997) ("Kentucky treats mortgage contracts as any other contracts, *see Yudkin v. Avery Fed. Sav. & Loan Ass'n,* 507 S.W.2d 689, 690 (Ky. Ct. App. 1974), and like other contracts, mortgage contracts need an express provision to create [ ] a [fiduciary] relationship."). No such provision is alleged.

were to the detriment of the fiduciary." *Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229, 242 (Ky. 2013) (quoting *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002)).

Despite Laurel's assertion that Freshway alleged only a contractual duty, the counterclaim's express terms are to the contrary. *See, e.g.*, DE 22 at 18, ¶ 57 (Laurel "was in a particularly unique position of trust and confidence, and therefore, owed fiduciary duties to Freshway."). Further, Freshway's factual claims are, at this stage, entitled to a presumption of verity and Freshway-favorable, rather than Laurel-proposed, inferences. Applying the generous Rule 12 rubric, Freshway essentially claims: Laurel offered to handle its clients' books purely to assist them "in making informed decisions regarding growth and profitability[,]" Laurel maintained "a staff of accountants and associates" solely to serve client needs, Freshway accepted this offer "around the same time as the Rittman Agreement[,]" and, from 2007 through 2016, Laurel was both Freshway's supplier and accountant. *Id.* at 12, ¶¶ 6, 7; *id.* at 14, ¶ 20; *see also id.* at 14, ¶ 21 (Laurel "had exclusive control over Freshway's books and finances[.]"); *id.* at ¶ 25 (claiming Laurel's position was "accountant for Freshway").

It remains to be seen whether Freshway, an admittedly "independent" business, can actually marshal proof to support the claimed accountant-client relationship. *See* DE 22 at 12, ¶¶ 6 & 7 (describing Laurel accountants as serving "independent" retailers); *id.* at ¶ 8 ("Counterclaim Plaintiffs[ ] are independent retailers[.]"). However, Laurel does not, at least for now, dispute the affiliation alleged, and the Court sees no basis to find that such a relationship is non-fiducial as a matter of law. *See Smith v. State Bd. of Accountancy of Ky.*, 271 S.W.2d 875, 877 (Ky. 1954) ("[T]he high stand[a]rds of a certified public accountant must be maintained in business transactions where he **performs accounting services as a fiduciary** and where his counsel is relied upon." (emphasis added); *McDorman v. D&G Properties*, No. 5:18-CV-36-TBR, 2019 WL

3367001, at *8 (W.D. Ky. July 24, 2019) (denying dismissal as to breach of fiduciary duty counter-claim and noting, *inter alia*, allegation that "Plaintiff's job duties included the management of finances and preparation of financial information, including but not limited to profit and loss statements, for the [Defendants]").[20] In this Rule 12 context, the Court finds that Freshway's allegations plausibly support a fiducial relationship.

      <u>Second</u>—Laurel mistakenly conflates the concepts of duty and breach for purposes of Freshway's fiduciary claim. It is true that Freshway alleges that identical conduct, failure to pay the 3% rebate, **breached** the Rittman Agreement and Laurel's fiduciary duties. However, Freshway expressly alleged that the contract <u>and</u> Laurel's fiduciary status independently required the rebate payments. For the contract, the duty and breach inquiries do somewhat collapse, *i.e.*, the contract allegedly required, and Laurel purportedly withheld 3% rebates. However, the fiduciary duty claimed was for Laurel "to act in Freshway's best interest[.]" DE 22 at 18, at ¶ 59; *see also Gresh*, 311 F. App'x at 770–71 (In a fiduciary relationship, a "duty is created in one person to act primarily for another's benefit[.]"). The Court, on this record and applying the generous standard, finds plausible Freshway's claim that Laurel's duty as accountant encompassed a prior assurance

---

[20] *See also Couch v. United States*, 93 S. Ct. 611, 622 (1973) (Douglas J., dissenting) (finding that "the nature of the accountant-client relationship" includes "certain fiduciary responsibilities"); *Cafritz v. Corp. Audit Co.*, 60 F. Supp. 627, 631 (D.D.C 1945) ("When auditors and accountants are employed for the purpose of auditing books and accounts they occupy a relation of trust and confidence to their employer based upon the superior knowledge of the business of accounting and auditing possessed by the auditors and accountants.") (quoting *Dantzler Lumber & Exp. Co. v. Columbia Cas. Co.*, 115 Fla. 541, 548 (1934)); *Iacurci v. Sax*, 99 A.3d 1145, 1156 (Conn. 2014) ("[C]ourts have concluded that the relationship between a tax return preparer and a client is fiduciary in nature when a heightened risk of abuse of trust or confidence exists, such as when the tax return preparer or accountant acts as an investment advisor or manages the client's funds[.]"). *But see Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 40 P.3d 1206, 1218 (Wash. App. 2002) ("[A]bsent special circumstances, an auditor is not a fiduciary of its client.").

to apply rebates to Freshway's account.[21] Thus, and despite Freshway's overlapping breach allegations, the counterclaim viably alleges distinct duty sources.[22] Kentucky does not forbid, on economic loss[23] (or any other) grounds, claims that simultaneous fiduciary and contract duties called for an identical performance. *Cf. Superior Steel*, 540 S.W. 3d at 792 (confirming primacy of "the source of the duty" claimed). Accordingly, Count 2 clears the low-slung Rule 12 hurdle.

*Fraudulent Inducement – Count 3*

Next, Laurel contends that Freshway's fraudulent inducement theory is "entirely predicated upon . . . failure to perform a contractual obligation." DE 23-1 at 10 (quoting *Federation of Appalachian Housing Enterprises, Inc. v. Parker-Hannifin Corp.*, 5:13-CV-181, 2014 WL 1093100, at *3 (E.D. Ky. Mar. 19, 2014)). Laurel thus argues that Freshway's fraudulent inducement claim is an improper "reassertion of [the] breach of contract claim." DE 23-1 at 10 (citing *Parker-Hannifin*, 2014 WL 1093100, at *3). There is some non-binding authority for Laurel's theory:

> This is precisely the sort of fraud claim disallowed by . . . *Mario's Pizzeria, Inc. v. Federal Sign & Signal Corp.*, [379 S.W.2d 736, 740 (Ky. 1964),] because it is

---

[21] Contrary to Laurel's contention, non-payment is a factual, non-conclusory breach allegation. *See* DE 25 at 6 n.6.

[22] The Court does not weigh or assess credibility of facts under Rule 12—rather, the Court **accepts** the facts and tests for a plausible liability theory. *See Iqbal*, 129 S. Ct. at 1959 (Souter, J., dissenting) ("*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be.").

[23] Laurel's economic loss argument principally relies on Judge Van Tatenhove's *Nash-Finch Co. v. Casey's Foods, Inc.* decision. No. 6:15-CV-86-GFVT, 2016 WL 7106395 (E.D. Ky. Dec. 5, 2016), *aff'd*, 762 F. App'x 218 (6th Cir. 2018). However, *Nash-Finch* did not involve an alleged fiduciary relationship. *See generally id.* Rather, the parties principally disputed who breached first. *See id.* at *3 ("The heart of the present dispute, then, is whether there are any outstanding issues of material fact as to the party responsible for the breach in the first instance."). Thus, Judge Van Tatenhove, though acknowledging that the existence of "an independent legal duty" could justify a tort claim that overlapped with "a contractual obligation[,]" was not confronted with a scenario calling for independent duty analysis. *Id.* at *7 (quoting *Mims*, 226 S.W.3d at 836). Accordingly, *Nash-Finch* is inapt.

entirely predicated upon the mere failure to perform a contractual obligation . . . or upon the failure to fulfill an agreement to do something at a future time or to make good subsequent conditions that Plaintiffs allege were assured.

*Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 727 (W.D. Ky. 2013) (citations omitted). Nonetheless, two factors convince the Court that the claim should (at least temporarily) survive.

First, the Kentucky Supreme Court, after *Mario's Pizzeria*, held that "the essential element in an action for fraud is **not** whether the representation is the consideration for contract for which a separate action may lie." *Hanson*, 865 S.W.2d at 307 (emphasis added). Second, as this District recently explained post-*Nami*, a fraudulent inducement claim is premised on **pre**-contract conduct and alleges "breached duties" that predate and, thus, logically do "not arise from the parties' contractual obligations." *New London Tobacco Mkt., Inc.*, 2019 WL 4597500, at *6.

Put differently, Freshway's claim falls within the exception that Laurel cites:

A claim of fraudulent or negligent misrepresentation is impermissible "where a contract is involved unless the misrepresentation . . . involved either **a matter extraneous to the contract's terms** or a risk not contemplated to be a part of the contract." *Thomas v. Brooks,* 2005–CA–001983, WL 13785510 (Ky. App. 2007).

*Gulf Coast Farms, LLC v. Fifth Third Bank*, No. 2011-CA-000965-MR, 2013 WL 1688458, at *5 (Ky. Ct. App. Apr. 19, 2013) (emphasis added). Given *Hanson*, and that Freshway's inducement allegations (as a fair inference) concern pre-contract conduct, *see* DE 22 at 12–13, ¶¶ 12–15, the fraudulent inducement claim survives. *See* 865 S.W.2d at 307 ("Since a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such intention is fraudulent and actionable in deceit . . . This is true whether or not the promise is enforceable as a contract. Restatement (Second) of Torts § 530 Comment c (1976).").

Freshway's promissory estoppel claim hinges on, essentially, the same allegations as its fraudulent inducement claim. *See* DE 22 at 21–22, ¶¶ 82–90. Laurel again contends that Freshway's allegations as to the existence of a contract, here presumed true, foreclose the estoppel theory. *See* DE 23-1 at 13; DE 25 at 13–15. On this point, the Court agrees with Laurel.

"Estoppel cannot be the basis for a claim if it represents the same performance contemplated under a written agreement." *Gonzalez v. Imaging Advantage, LLC*, No. CIV.A. 11-243-C, 2011 WL 6092469, at *2 (W.D. Ky. Dec. 7, 2011) (citation and quotation marks omitted). "[T]he real crux in such cases is whether the induced **performance** . . . is the same as that contemplated under [a] written agreement." *Id.* (emphasis added). Here, the relevant performance, Freshway's purchase of grocery products from Laurel, was, per the pleading, covered by two contracts. Namely, the Freshway-alleged "Rittman Agreement" and the "Rittman Customer Application and Agreement." DE 22 at 13, ¶¶ 15, 17; *see also* DE 1-1 at 22–23 (agreeing that "sales of products by Laurel . . . will be based on" the second-page's "terms and conditions"). Freshway, seeking to avoid this bar, argues that an estoppel claim may be pleaded in the alternative "when the validity of the contract is in dispute[.]" DE 24 at 6. Yet, neither Laurel or Freshway has argued or alleged that the Rittman Agreement is void, voidable, or otherwise invalid. Mere speculation that a contract might be deemed unenforceable "is insufficient to survive a motion to dismiss." *Gonzalez*, 2011 WL 6092469, at *2.

Moreover, "Kentucky courts have consistently held that promissory estoppel applies to gratuitous promises, unsupported by consideration." *Davis*, 399 F. Supp. 2d at 797. Here the subject promise, if made, was hardly gratuitous. Logically, a "rebate" promise is contingent on a purchase. Thus, as alleged, and inherently, the purported assurance was inextricably linked to

Freshway's grocery purchase consideration. Freshway's side of the bargain was foundational for two contracts. That actual consideration leaves no role for the estoppel gap-filler. *See McCarthy v. Louisville Cartage Co., Inc.,* 796 S.W.2d 10, 12 (Ky. App. 1990) ("The whole theory of a promissory estoppel action is that detrimental reliance becomes a substitute for consideration under the facts of a given case.").

In sum, "it is a widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract[.]" *Shane v. Bunzl Distribution USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006) (citation and quotation marks omitted). Thus, "where a contract exists on the subject matter of the alleged promise sought to be enforced, a claim for promissory estoppel is not cognizable." *Jan Rubin Assocs., Inc. v. Hous. Auth. Of Newport*, No. 03-CV-160-DLB, 2007 WL 1035016, at *14 (E.D. Ky. Mar. 30, 2007). Because two contracts govern the subject matter of the alleged promise, Freshway's promissory estoppel claim fails as a matter of law. *See Derby City*, 949 F. Supp. 2d at 730 (collecting cases dismissing, at the Rule 12 stage, promissory estoppel claims on this basis).

## III.      CONCLUSION

For all these reasons, under the applicable standards, the Court, to the extent stated, **GRANTS** DE 23 **IN PART**, and otherwise **DENIES** the motion.

This the 30th day of December, 2019.

Signed By:

**Robert E. Wier**

**United States District Judge**